Case No. 18-1209 et al., Northstar Wireless, LLC and SNR Wireless License Co., LLC, Appellants v. Federal Communications Commission. Ms. Stetson for the petitioner, Northstar Wireless, LLC. Ms. Slaad for the respondent. Morning. Good morning, Your Honors. Good morning. May it please the court. Good morning. My name is Kate Stetson. I'm arguing for Northstar and SNR this morning. This case is here after a remand to the FCC, and when it was last here in 2017, this court held two things. First, the court upheld the commission's determination that SNR and Northstar's agreements with their investor, DISH, gave DISH too much control over those small businesses for them to qualify as designated entities suitable for bidding credits under an auction. Second, though, this court also held that the commission had failed to give SNR and Northstar sufficient notice that if a control finding was lodged after the auction, of course, that they would not be permitted to cure that control finding as other applicants had. So this court remanded to, and I'll quote here, give petitioners an opportunity to seek to negotiate a cure for the de facto control the FCC found that DISH exercises over them. That's pen site 1025 of the prior opinion. The FCC did not give petitioners that opportunity. Instead, taking one sentence of this court's opinion out of context, the commission simply directed SNR and Northstar to renegotiate their agreements with DISH and to submit those amendments to the commission for further comment and review. There was no discussions with commission staff, there was no guidance, and there was no negotiation of a cure. The petitioners did what they could without staff input and submitted amendments addressing- Yes, you did meet with a couple of the commissioners, I believe three of them, and one of their commissioners' staff before the decision was issued. Is that correct? We did, Judge Millett, less than a day before the decision. One of them was more than, one meeting was more than that. If you're discussing, if you're talking about the May 2018 meeting with Commissioner Clyburn, that actually had to do with the draft opinion from the commission denying the petition for review of the remand order itself. So that did not pertain to the amendments which hadn't been approved. The amendments which did pertain to the November 2020 meetings, those, of course, came almost two and a half years after the- You just said the day before, but I think you met with three of the commissioners on November 2nd. You met with one commissioner, Commissioner Carr, on November 2nd, and three of them on November 16th at 1130, one, and four, I believe. The opinion that we're talking about now issued on, was adopted on November 17th and made public on the 23rd, but more to the point, Judge Millett, the window closed for amendments in June of 2018. So the fact that we were permitted an opportunity to talk to the commissioners, not with, and certainly not to receive guidance from them, one day before this 90-some-odd page opinion issued is cold comfort. The fact is that was not the process that this court ordered. It was not the process that ClearComm followed. I have another question. It seems as though SNR did exercise its put and is now wholly owned by DISH. Does that move their petition? It doesn't, and let me make one correction. SNR has notified DISH that it intends to exercise its put, but that is subject to the FCC granting an application for a transfer of control. That application hasn't even been filed yet, likely will be filed later this spring. So as things stand now, there is no, it's status quo, there is no transfer of control whatsoever. We'll, of course, update the court, you know, if or when that occurs, depending on... SNR has said it does wish to issue its put. It does indeed. SNR, not NorthStar, but SNR, but none of that, of course, has transpired yet. Ms. Nesson, can we go back to whether or not some sort of an iterative process was actually ordered by the court? You accuse opposing counsel of focusing on, you know, one sentence in the opinion and using that to evade their responsibility, but I don't see in the opinion where this court actually required the kind of iterative process that you say is now was mandated. So can you help me to understand where you come from, where are you getting the argument that you needed to actually have the opportunity to engage in the type of process that ClearComm indicated? Certainly, Judge Jackson, and I think it's in the prior panel's discussion of ClearComm itself and in its pin sites to ClearComm. If you look at ClearComm, and I would direct you in particular to two paragraphs, paragraph 7 and paragraph 24. You'll see in paragraph 7, among other things, that ClearComm talks about the meetings and conference calls that were held with respect to the petition for reconsideration. And then, even more important, paragraph 24, look at footnotes 99 and 100. Footnote 99 says, in the course of resolving this issue, it became clear that one of the parties was operating under a misconception. That was cleared up. Footnote 100, this issue arose during the course of meetings and was not substantively briefed, but the petition concluded, the commission concluded, it could reach that conclusion anyway. What is your response? I understand what actually happened in ClearComm, but what is your response to the argument that the prior panel only cited ClearComm in support of its fair notice finding as a potential reason why your client might have been confused into thinking that some cure opportunity was going to be provided, as opposed to being cited for a duty to actually engage in that type of negotiation? I don't see that, and I worry that a holding to that extent actually is inconsistent with what I understood the prior panel to be saying about actually curing, if not what they were ordering, that the FCC could, in fact, as long as it gave notice, not even give you an opportunity to cure, as long as up front they said clearly, you get one shot at this. So if that's true, if the FCC did not have to actually give you an opportunity to cure, it's confusing to me that you're suggesting that the panel also held that any opportunity to cure had to have certain features. Judge Jackson, let me take that a couple bits at a time. The first is the quote that I read to you at the beginning of the argument, which is, this court remanded to allow petitioners an opportunity to seek to negotiate a cure for the de facto control the FCC found. So we can slice the opinion as the FCC does to suggest that, well, they never said here is the process to be followed, but of course they didn't need to. And that's the second thing that I would offer to this court. In 2006, in a final rule, a commission final rule, I might add, this is a final rule that is cited by the prior opinion at pin site 1046. The commission said this, and bear with me because it's a 22nd quote. In applying our controlling interest standard, commission staff has carefully reviewed agreements between applicants claiming designated entity status and other existing wireless carriers. In these cases, staff has usually undertaken discussions with such designated entity applicants in order to obtain revisions to agreements to ensure that entities with whom they've partnered are not an attributable controlling interest. So we don't need to go excavating through ClearComm and its footnotes to see exactly what the commission directed happened. That is from a 2006 final rule. I was just going to follow up by saying, so is it your position then that what was necessary here for the FCC to avoid reversal was to give you some kind of an iterative process? And if so, how much of an iterative process? Enough that you would actually cure? Are you saying we have to be able to solve all of the problems? No, we're not, Judge Jackson, and that was a point that the prior panel made as well. Nothing obligated the FCC to permit a cure, but what the FCC has done, and it's understandable because, of course, the FCC in these discussions, the reason it has these discussions is not only because of the timing problem we're talking about, the fact that these examinations are made after the fact, after the auction and after money is committed and bids are upheld, it's that the FCC in these discussions actually is supposed to be a force for good, helping the designated entities obtain some leverage against their investors. That's why the FCC participates in these discussions alongside the designated entities and their passive investors. So the fact that the FCC declined in this instance, unlike every other instance, to participate in these discussions... What more could it have said? I mean, in this case, you had a whole opinion by the FCC that had focused on the deficiencies. I'm not sure what more you hoped to glean from a back and forth with the actual commission staff. Two things. The first is, in ClearCom, the parties had a whole letter identifying at least 30 questions that the FCC had about the transfer of control in that case. The second is, as we point out in our brief, the fact that we had an opinion is cold comfort for two reasons. The first is, the FCC emphasizes this over and over and over again. The totality of the circumstances analysis is the touchstone of the FCC's process. So the fact that the FCC in 2015 identified a number of deficiencies, which we cured, apparently was not enough. Because as you will have seen, the FCC in 2020 came back with a number of other concerns, including concerns that were present in the 2015 agreements. So not only was the 2015 order some kind of panacea, it just identified the problems that could, combined, lead to a control finding. And you'll notice, if you've read the 2015 opinion, what the commission says over and over again is, this might not be a problem standing by itself, but in combination with these other problems, it's an issue. In 2020, what the commission chose to do is to say, yes, yes, you cured the major things that we identified in 2015. You terminated the management services agreement, which permeated the 2015 opinion. You terminated the technology. You terminated the trademark agreement. You completely revised the investor protections in order to come within the six things prescribed by Baker Creek, and the six things I would mention that the commission at footnote 232 of its 2015 order said are common passive investor protections. We did all of those things, and then the commission came back and said, ah, but you've got this common... You changed some other things too, though. Not all you did was tell me why they're wrong, that you created more new problems. For example, on the investor protections, and particularly the control over leasing decisions, eliminating the ordinary course of business, for example. And so there were a number of other... It wasn't as though you just erased the things they didn't like and everything else was status quo. What they point to is a lot of new things that came in, and the continuing put obligation, which was flagged in the fifth memorandum of union order, and it was mentioned in oral arguments as a real problem in this case. In fact, from the commission's view, and you can tell me why they're wrong, from their view, the pressure to exercise that foot remained because of the ballooning equity stock that was now going to go to dish and the constraints, the very hard constraints on their ability to finance building a network, building out and doing anything to actually function successfully as a business. This is my summary. They'll tell me if I got it wrong, the changes, or the repackaging, they might say. I'm not saying that, but the problems, as opposed to the pure elimination of them. So let me break that into three parts, if I could. The new stuff, the put, and then the money. With respect to the new stuff, the major problem is stuff isn't new. What the commission identifies is a lease, a common investor protection that gives a passive investor the decision whether to permit a lease of all or some of the assets, including license. The terms of that lease changed, you have to admit. No, they did not, and I'm sorry, Judge Millett, to push back on you, but if you look at 6.11. The ordinary course of business limitation on their authority, Dash's authority, still in or out? The ordinary course of business limitation, I think, sits alongside the lease of major assets. A lease of major assets wouldn't be in the ordinary course of business. How would that not be when the whole point of what they're trying to do here is build a network? If they wanted to lease them so they could build a network, that's their business. That seems to me quite the ordinary course of business. It is a common investor protection, again, Judge Millett, to permit passive investors to have a say about whether... It didn't change. The ordinary course of business language was eliminated, correct? I don't believe it was eliminated. I think it was added to. Let me refer you in the 2015 agreements, and then we can go on to the foot, to JA180 and 183. This is 6.11c, which prohibits the petitioners from leasing all or substantially all... What's that in there? That is... No, that's, I think, the LLC agreement, JA180. And then section 6.18, a few pages later, and I see that I'm over time, but I hope you'll permit me to finish this. 6.18, which is JA183, prohibits lease of property or assets now owned or hereafter acquired by either petitioner except in the ordinary course of business. That's still in the 2018 agreement? That's the 2015 agreement. Right, so that's still in the 2018 agreement. What the 2018 agreement says is that the lease of major assets is a significant matter requiring approval. I'm reading JA1664, note 140. Give me a second to catch up to this. Sorry. JA, which page again? 1664, note 140. And that's... This is the... Characterization of the 2015 agreement. One of the issues we have here is, of course, what they say in that... Sorry, I'm so apologetic. I'll give you a minute. JA1664, note 140. And this was a major... While you're finding that, let me give a little context. 140? 140, note 140. The commission says in this footnote, just for the benefit of others if they haven't found it, under the 2015 agreements, the applicants could lease their spectrum without seeking DISH's approval. That is simply false. That is a premise, an underlying premise. I think the entirety of the question is that the limitation on DISH's veto authority still happened by that ordinary course of business language under the 2018 agreement. So if you could point me to where that ordinary course of business language remains in the 2018 agreement, I think that would be most helpful to me. I will try to find during Ms. Flood's argument what, if or where, that joint appendix site remains. But here's the more important point, I think, Judge Millett. As we say on our briefs, the leasing of major assets and assets leased outside the ordinary course of business, those are two different ways of saying the same thing. And more importantly, the FCC never acknowledged below that there was a prohibition on leasing. We can quibble about whether it's defined under significant matter or whether it's a lease on the ordinary course of business. A lease of all of the assets wouldn't be in the ordinary course. The more important thing is this leasing provision is a standard investor protection. And that gets me to my second point. So is a put. A put, as the Fifth Memorandum and Order says, this is paragraph 95. These aren't categorical rules. It's not that a put is just fine. And they had huge concerns about the put before. All of the sort of hydraulic pressure that was going to be on SNR and North Star to exercise these puts because of their extraordinary indebtedness and constraints on their ability to commercially exercise and develop these licenses. And they said, you can tell me actually how they're incorrect, but they said that pressure remains. It was redesigned, but it was eliminated. This is why they're incorrect, Your Honor. And forgive me because that too, I think, requires a couple of corrections. First, as I said, a put is actually a standard designated entity protection. That's what the Fifth M-O-N-O said, paragraph 95. That was in 1994. The colloquies that I think you're referring to in the prior oral argument, Judge Millett, if you look at them again, it's mostly Judge Pillard, if I remember correctly. Judge Pillard is talking about something that Fifth M-O-N-O says, which is if the put in combination with other things, and you'll find this actually in a quote in the SNR decision itself, a put in combination with the management services agreement and other capital contributions is greatly concerning. There has never been an instance where the commission has found impermissible control with simply the existence of a put. And not only that, but Judge Pillard also made the point that perhaps the commission could permit a correction to the put in the form of multiple puts, which the designated entities implemented, multiple larger windows, which the designated entities implemented. So what this reduces down to, sorry, Judge Edwards. Go ahead. Finish up. I'm sorry. I wanted, if I could, just to make the third point in response to Judge Millett's question, because I think it flows from this. What this reduces down to, if you look at the 2020 decision, is that the lease, which is a lease discretionary prohibition, which is a standard investor protection, the put, which is a standard item of fare in designated entity agreements, all of those are not useful or suitable here precisely because, Judge Millett, there's so much money involved. But since you've read the transcript of the first argument, you also have seen that Ms. Flood mentioned at the time, that's not our argument. Our argument is not that the money is the issue here, but every bit. Not by itself. Not by itself, but that's part of the problem, right? I mean, it's the put in combination with the money, but if the put isn't the problem, then the money is. And for the money to be an issue. That's kind of how it works in most of your things. One, they didn't say it's just put in money, right? The put by itself or the money by itself. So it's the put and the money, and this time around, and they could be wrong. They could very well be wrong. But the put and the money, and the way there was going to be all this building, building, building debt, building equities, more and more, because they had all these obligations to pay, to pay these dividends. If they didn't, they just kept getting more and more equity. And these deadlines that would be coming on building out. And the inability to, a number of constraints on their ability to enter leases or contracts to sort of build out this network. I don't think it's fair to say, I mean, one of your fair notice concerns is this is such a sort of Rorschachian type analysis with all these multiple factors. So I don't think it's going to be fair for any of us to sort of pin one and one and the other, but it was sort of that, she may have more to add to the list, but that sort of dished out at least as to this investor, this aspect of the investment. All right. Let me ask, I would like to ask this, in your reply brief, you are, I think making the point that you're trying to wrap together here, but I want to make sure, so will you just amplify this a little bit so that I make sure I'm getting it. You say the commission has never before concluded that an investor protection provision gives an investor de facto control absent a management services agreement giving substantial day-to-day control to the investors. That is correct, Judge Edwards. And that's something we also said, I believe in our opening brief and invited the FCC to disagree with us. And that I think is part of the issue here that actually does map onto Judge Millett's question as well. There is a gestalt aspect to this, right? Because of this totality of the circumstances analysis, what would have been so helpful are discussions with commission staff so that we can understand if or how to correct those things. And Judge Jackson, the discussions don't need to result in a cure. There could be a point where if commission staff puts too much emphasis on an aspect of the agreement that DISH simply won't accede to, then there's no designated entity status. Let me ask you, in this allegedly unclear world from your client's perspective, why didn't your clients do more after there was the opportunity to do more when there were comments that were made? So we had the remand and you claimed that the process wasn't sufficiently iterative, but you did submit your paperwork. And then my understanding is pursuant to the FCC's process, comments were made concerning whether or not you had met the mark. And at that point, your clients decided to stand on their submission and not make any changes. And I'm curious as to why that is and therefore how you can support the claim that you would have even done more had there been more communication from FCC staff. Certainly. And just to be clear on this, the comments that were made were not, of course, made by the commission staff or by the commission. They were submitted by other disgruntled large bidders. But here's the real heart of the matter. In March of 2018, SNR actually sent a long letter to the commission saying, look, if you're not going to meet with us, here are a number of questions we have about how or whether or in what way we can correct for this totality of the circumstances analysis so that the totality of the circumstances don't add up to a finding of control. And what the petitioners did when they finally submitted in June of 2018, Judge Jackson, they didn't just fix a couple things. As you know, they terminated the management agreement. They terminated the trademark agreement. They terminated the interoperability requirement. They lengthened the interest period. They converted a huge raft of debt to equity, making these two petitioners much more highly leveraged than other DEs in the same auction. They decreased the interest rate. They did a huge number of things. Of course, these disgruntled other big bidders were going to come in and say, well, you should have done more. But at that point, under Baker Creek and under Intermountain Microwave and under Judge Edwards's point that never in the history of a DE has there been found to be control without the management agreement also being present, these petitioners were entitled to think they had done enough. Nothing required them to... Right. But if you are correct that they don't have to have the opportunity to actually mail it at the end of the day, then the FCC could make the determination on the totality of the circumstances test that all of the things that they had done, including the things that they changed and added as Judge Millett pointed out, was still not enough, right? And I have a question about the standard of review in terms of this court's analysis at this point. Isn't it that we have to give the FCC some deference? I mean, are we de novo now evaluating whether or not we think you did enough under a totality of the circumstances test? So let me work backwards, Judge Jackson. The answer is yes. This is a fresh analysis. Whether you look at this as a question of the mandate rule, whether you look at it as a question of the commission's compliance with 47 U.S.C. 402H, which directs them that it shall be the duty of the commission to implement the court's mandate, or whether you look at this as just a simple administrative procedure exercise in which the commission, rather than being accommodating of this court's prior opinion, read it in the most miserly way possible and denied the opportunity that this court requested these petitioners engage in. It's de novo review, but backing up to your point about the opposition's raising more questions, that is not an opportunity to cure. The party that has the cure power is not AT&T, it's not T-Mobile, and it's not Verizon. It's the commission. The commission was dead silent from 2017 through 2020. I mean, that's still an opportunity to cure. An opportunity to cure is your ability, and the curing is by you. Correct. It's not by the commission, and we were very clear about that in SNR. There's no obligation. I'm not permitting it at the end of the day. Yes, Judge Millett. I can't hear what you're saying. The opportunity to cure includes the opportunity to talk to staff about what a cure would look like. Remember, this is a protective discussion for the benefit of these small entities. Going back to that 2006 final rule, I will point the important- Stephanie, in our case, isn't there language about renegotiating the contract with DISH? There is a line. Yes, that is the one line. Yes, that is the one line, but it doesn't say negotiate a cure with DISH, right? It never says that. Again, I would point you back to that- No, no, no, it does. I mean, I'm sorry, Judge Jackson. Yes, please. 1046, repeatedly, they say, petitioners can't contend, I'm in the right-hand column, that in the past, the FCC has compensated for lack of clarity by giving small companies a contractual agreement with large investors, right, in an effort to give the small companies enough independence. Petitioners seek precisely that kind of opportunity to modify their agreements with DISH, right? The FCC didn't put clear notice that such an opportunity to modify your agreement with DISH, right? We renegotiated an opportunity to renegotiate their agreements with DISH, the appropriate remedy here. What I don't see anywhere in the opinion is saying you get to, other than once when they're describing your argument, that you get to go have sit-downs, multiple sit-downs, or even just one with the commissioners themselves. Judge Millett, a couple answers. The first is the passages you just read, of course, don't include the word cure. The rest of the opinion speaks to- In fact, if I counted, it's like more than 20-something times. It's just a cure, a cure, a cure, and I didn't see a single time. Sometimes it did say negotiate a curve, but there's no object for who that negotiation is with, which seems to be what this language on 1046 is answering. But I guess for your argument that this was a miserly reading of the opinion, if you could point me to where they say, not in describing your argument, not in just describing the ClearCom case, where in language, independent language of the court, they said that you have a right to negotiate with the commission or the bureau on this. Can you point to that language in the opinion? That language, the precise language about negotiating with staff, of course, isn't in the opinion, but that's the point of the court's site ClearCom. And here's something not to lose sight of as well. Does that become vice president when a panel cites another case and describes its factual context, but never, despite having more than 20-something opportunities in the opinion to include that language, never did? I think, Judge Millett, the reason they didn't feel like they needed to is because, as Ms. Flood will confirm, it is standard for these discussions with staff to be held in the open. Because this is not something that this court was prescribing. This court was instructing the commission to do the thing that the FCC in 2006, in that quote that I read earlier, does with respect to designated entities. It enters into discussions with designated entity applicants, and the objectors, by the way, and the investors. Precisely so, people are in the room to discuss what changes, if necessary, could be made to the agreements to ensure that these designated entities actually have the protections that the FCC wants them to have. So if you're right about that, then why don't we have the very moral hazard problem that the court was concerned about and that it was focused on when it made its fair notice pronouncement? I actually think that the court wasn't concerned about the moral hazard problem, Judge Jackson. The court rejected the moral hazard argument that the FCC made the last time around. Precisely because it said, but it rejected that argument precisely because it said that it doesn't, that the opportunity to cure doesn't mean you will actually ultimately get it. Yes. I'm sorry. I was just going to say the moral hazard problem arises if, as you suggest, the party has an ironclad opportunity to sit down with FCC staff and correct all of its deficiencies such that it will actually cure at the end of the day. Then you have a moral hazard problem because why would anybody make their best effort at the beginning when they know they have this opportunity at the end of the day to hear exactly from the decision makers what they need in order to make sure that their arrangement satisfies the standards? So, Judge Jackson, I think the answer is this is not, and we're not asking for, an ironclad opportunity to sit down with staff and negotiate a solution and a cure to every last deficiency. We are looking for guidance from staff through those discussions that the commission has identified occur in control cases precisely to give these designated entities a little more leverage than they may have. This is not some kind of an ironclad guarantee of a cure. The point of the remand and the point of the commission's prior processes is to negotiate a cure, to find out what could change in this totality of circumstances, what could be put in or taken out that would change the way that those scales are revered. Remember, too, this isn't just protective to the DE aspect that I mentioned. The timing of this matters. The way that these auctions are conducted, all of these decisions and discussions occur after the bids are made and won. Because your bidders made a commitment to pay full price on all the bids they made before they made those bids. They made an upfront commitment that they could pay the full price of what they are bidding. This process comes afterwards because you've already committed to pay that full price, but let's figure out whether we can give you a discount. It's not like they're saying you might be or might not. You have to do some contingency in your predicting. They say don't make the bid if you can't follow through on the full price. We submitted in the short-form applications, of course, the grounds for designated entity status. You may have, but you made a commitment. Your clients made a commitment as well, did they, not to pay the full price of every bid that they made? Yes. That's a point the commission made during the last oral argument as well. I think the response of this court in the prior opinion was it is not fair notice for that huge commitment to be made without an opportunity to see, as applicants have sought before, discussions with staff. I would suggest that FCC counsel might be able to answer the question. They never answer in their brief. They never even respond, by the way, to the 2006 discussions language that I just read, which is does the FCC do this or not? Do staff do this or not? The answer is staff did this all the time. Now, in more recent years, staff has said and the commission has said don't expect an opportunity, but staff did this all the time. We don't need to go on some archaeological dig or through this court's prior decision. I have two other questions. I know I interrupted you, Judge Jackson. No, that's all right. Please. You talked about what was interesting in the investor protections here that there's a qualification that says, I'm paraphrasing, you can say more accurately, but to the extent allowable by the Baker Creek decision. My question is if, say, SNR or North Star, forgive my language, my throat, if SNR or North Star wanted to enter into a lease or something and DISH says no and there's a disagreement between them as to whether it would be consistent with would be allowed or not under Baker Creek. Would it be appropriate for DISH to say no under Baker Creek? Who decides that? I think the answer is it's a process that wouldn't happen because the FCC was supposed to decide that. The reason that that language. I don't understand what that means. Even before that conversation occurs that you're talking about where SNR would come to DISH and say we would like to lease our spectrum in order to monetize this. The FCC, in looking at these amendments, had the opportunity. First of all, this all could have been solved by discussions, right? But had the opportunity to say that leasing provision, in our view, isn't consistent with Baker Creek. So, we strike it. So, if the FCC has done that. Wait a minute. I'm very confused. You wanted these agreements approved as written. You think that as written, your amended agreements for both companies demonstrated that there was no longer a disqualifying control by DISH. And now I'm saying if they had signed off and then two years later or a year later, this conversation, this disagreement comes up between North Star and DISH as to whether they can lease out 60% of their spectrum to some other company to help develop. You're saying the FCC will have already said whether as to that specific dispute. I don't understand how that works. That's what I'm trying to ask. Let me clarify. I think there's two, there's sort of a fork in the road when those amendments were submitted in June of 2018 to the Commission, right? I think your hypothetical is presuming that those amendments were accepted as submitted. Correct me if I'm wrong, but that those amendments were accepted as submitted, that that standard investor protection was found to be appropriate. And you wanted it to be. That's your point on the merits, is that this should have been approved as written. Yes. I'm saying you may have won that. Say they said, okay, we agree with that. Yes. You wanted them to say agree with that. And then this happens. What happens then? I think then DISH would be exercising the right that any standard passive investor would have to say yay or nay as to a lease of a significant amount of assets. No, no, no. I forget how I did my hypothetical. Northstar, they say, wait, you're violating Baker Creek. We think we get to do this. No, Your Honor. I think the reason that that belt and suspenders have the final answer, whether something was consistent or not with Baker Creek. Exactly. Yes. Because the FCC has already made that pronouncement. I think where you and I had the disconnect. He's already said that DISH, if it signs off on this agreement, that if it's unclear, because all the agreement do is cite to the list of standards in Baker Creek, nothing more, not even its analysis. If there's disagreement about whether it's consistent with Baker Creek, DISH wins. I think there are, in some circumstances, dispute resolution processes that haven't become relevant to this case. But I think that the disconnect. I'm sorry? In the agreement itself as to this question? I don't know as to this question, Your Honor. This hasn't become relevant to this case until this hypothetical. So I confess. But I think the disconnect is that the reason that that language was in the amendments as submitted without the input of staff, looking at past auction recipients, including this same auction DE recipient status, looking at what the commission had previously said, looking at Baker Creek is, if we are wrong, tell us we are wrong. Okay. And just if I could put one more point on that, the way that this all could have been cleared up is discussions. And then ascertainable certainty. Can you tell me, articulate for me exactly the definition or meaning of ascertainable certainty that you wish to have applied here? Because we've articulated it different ways. What do you think is the right articulation of the ascertainable certainty test that we should apply? I think the right articulation, probably the closest approximation to our standard, is the DC Circuit's general electric opinion. Ascertainable certainty means that a regulated entity is able to look at the actions of an agency and determine whether its actions fall inside or outside of the fair and foul line. That gets to the very end of our brief and the substantive fair notice argument that we have, the point that Judge Edwards made some minutes ago, which is even if you get past the problem with the remand, the problem with the lack of communication, the problem with the new control finding that wasn't based on the old control finding, you are left with a control finding that these entities had no understanding how to determine with any ascertainable certainty would happen precisely for the reason we discussed. Never in the history of a designated entity program has control been found without a put plus something. That was the issue. What I don't understand is how the ascertainable certainty standard can encompass more than knowledge of the standards or the tests that will be applied by the agency. You seem to suggest that in order to have ascertainable certainty, you have to know exactly how that standard is going to be applied and therefore whether you will win at the end of day. If you lose, you have no fair notice because you looked at the standard and thought you might win. I don't understand how you get away from that unfortunate set of circumstances that undermine all of judicial notice and litigation and that kind of thing. I think it's an unusual set of circumstances but not necessarily unheard of. There are two problems I think that contribute to this. The first is of course the totality of the circumstances standard because that standard in the FCC's hands in this decision and in 2015 became essentially anything that FCC wanted it to. I'm sorry, isn't the totality of circumstances pretty standard in application across all sorts of circumstances? It is. It is such action but that's why you look for footholds in other places, right? That's why you look to Baker Creek to see what are the investor protections have been found to be okay. That's why this court actually in 2017 said with respect to the fifth memorandum opinion and order, that paragraph 95 that I mentioned, there was fair notice that a put option in combination with a management service agreement and capital contribution is potentially a problem. That is the kind of fair notice that we're talking about. But here, when you've never had the commission say... Agencies can make law through case-by-case adjudication, right? Yes. You can do that here as well. There's nothing about this area that forbids making law through case-by-case adjudication. No. I mean, that's what the commission said in 2006. Even if they haven't encountered a particular problem in the past, when they encounter a new problem, as long as there was... This is where I think your action is, of course. As long as there was sufficient notice as to the standard and the concerns that they would be looking for, even if not the particular factual scenario that was... This isn't qualified immunity analysis, right? We are looking for an exact fact pattern that has been approved... This is not qualified immunity. But I think part of the issue here, too, is the commission's instruction that folks not look to anything other than commission decisions for guidance. But what we're left with, in combination with those timing issues we talked about, which of course played a central role in the court's prior opinion, is a situation where you commit the money, as you said, Judge Millett, then you have the examination of the control status, then you have, precisely because of this totality, the circumstance analysis, you have discussions with staff to figure out where the minefields are, where the problems are. And then if you can cure them... Yes, but it's not an unfair thing. You've committed to pay the full amount, and then they say, afterwards, we'll look and see if you qualify for this special status. And they didn't sanction you for not qualifying for special status. They sanctioned you for violating your obligation, your commitment to pay full price for all the bids that you made. And so all they're doing here at post hoc is saying, maybe we can get you a discount. But when they don't, then you still had already... I mean, that'd be icing on the cake. But you had already made a representation to pay all of this stuff. Judge Millett, you began that question by saying it's not about fairness, but the prior panel, of course, said that that's exactly what it's about. Prior panel said... Hundreds of millions of dollars are at stake. Regulated parties need fair notice of the circumstances in which a finding of defective control will and will not be subject to an amendment.  And so the amount of money just means the spectrum that they hold is incredibly valuable. That's the point of the amount of money. And value means assets and equity and everything that the designated entities need in order to make this work. The fair notice is because these entities were not given a chance simply to have a discussion with staff about how to cure things. And as I said, we don't need to go back and do a dig through the court's prior opinion even to find that. The commission itself in 2006 told us that these discussions happened. Do my colleagues have any further questions? We've kept you up a little bit over your time here. Very good. Thank you very much for your assistance. We'll give you some time on rebuttal. Thank you. May it please the court, Maureen Flores for the Federal Communications Commission. I'd like to start with a fair notice point. This court in its 2017 opinion found that the petitioners had fair notice that the commission would find the petitioners under control of DISH. Now with the benefit of the same rules and the same press net that the petitioners had before, plus a lengthy commission order and a court decision, plus comments from parties of record in the proceeding below, the petitioners had more than fair notice of how to comply with the commission's control rules and press net and how to demonstrate that they were no longer under the de facto control of DISH. Ms. Flood, can I just ask you the matter that's a principal concern to me as I'm looking at this case. In my understanding of administrative law cases, and this goes across the board, totality of circumstances is always a loose standard and it can be troublesome depending upon how it's applied. It can mean a lot. It can mean very little. And my understanding has been in all the years I've been doing this, the totality of the circumstances is always defined by reference to agency practice. And that's what gives the affected party some understanding of what is within and without the totality of circumstances. If it is true, as the other side says, that the commission has never before concluded that an investor protection provision gives an investor de facto control absent a management services agreement, giving substantial day-to-day control to the investor. How can you get it here? That makes no sense to me. And it really is no answer to me to say, well, but the commission is not precisely bound. They can do whatever they want. And it doesn't have resulted in a scenario in which there's never been, however it's done, there has never been a finding of de facto control where you have investor protection provisions, but you do not have a management services agreement giving any substantial day-to-day control. Why should it happen here? Because your honor, the commission told the petitioner in the 2015 order that consistent with our application of the Intermountain Microwave Test, the six-factor test, that the commission could find control, even if it only found problems under some, but not all of those six factors. And as we explained in our brief, and we explained in the order, elimination of the management services agreement only cured the commission's previously identified control concerns under two of- What is it they had reason to know that would make a difference? Because your honor, the commission had told them- No, but I mean, what is it in the totality of the circumstances that they got any indication that would cause them to, we sent the case back. We don't normally send a case back like this, unless we're concerned that the affected party, the challenging party really doesn't yet know what's required. I mean, that's the key to me here. We don't send a case like this back with a long, long, long opinion, with lots of things saying that the FCC's right on this, the FCC's right on that, the FCC's right on this, but you know what? We're sending it back. You know what the but was? The but was, in my view, when I read that decision and listen to the arguments here, the but was they don't really understand what it is they need to do under this totality of the circumstances test to cure whatever problem it is that the FCC has in mind. Your honor- Because what they have in mind is not being revealed. And I don't think you win in an administrative law case if that's the scenario. And I mean, there's lots of areas of law where that's in play all the time. Totality of the circumstance is great when the agencies want to fling it around and say, that's all we have to tell you. We can weigh everything. That's total nonsense. You can't invariably weigh everything. You have to explain to parties what counts on the scale and what does not count on the scale. And they have to have a fair understanding of that. You don't have to handhold them all the way through the process. I'm not disagreeing with you there, but they have to be able to find some indication of what will make a difference and why. And if they are right, that we have investor protection provisions that never has resulted in de facto control finding from the FCC, never, where there has not been the day-to-day management services agreement, never. And you're not refuting that, then I'm not getting it. Yes, your honor. And there were problems under four of the other six intermountain microwave factors identified in 2015 that have nothing to do with the management services agreement. So for example, the money was a huge issue and petitioners overwhelming financial obligations to DISH, in addition to DISH's ability to signing their ability to pay off their debts. So for example, it was very clear in the 2015 order that the commission was concerned that DISH could prevent the petitioners from monetizing their licenses by building out networks and generating revenue that they could use to pay off their debt to DISH. Eliminating the management services agreement doesn't do anything to resolve that concern. The commission was concerned about the fact that petitioners, this was in the 2015 order, that petitioners could not exit the business without DISH's consent. The petitioners knew that going into a mature proceeding, what did they do? They consented to a restriction that basically barred them from selling their licenses to any competitor of DISH's, even though those are the only potential buyers of the licenses. The commission expressed concern in this 2015 order that the petitioners would never make a profit from their licenses because they would first have to pay off their debt to and only after they did that would they be able to generate a profit, and that was unlikely. So all of these issues, you're asking me what fair notice they had. The fair notice they had was the commission's analysis under the 2015 order, and as we thoroughly explained in the order on review, eliminating, and we gave them credit, we gave them credit under two of the six intermountain microwave factors for eliminating the management services agreement, but petitioners did not see did not do anything to resolve the clearly identified problems under the four other intermountain microwave factors, and in fact, petitioners in their brief barely grapple with our intermountain microwave analysis. All they do is say, well, we got rid of the management services agreement, that's enough, but as we explain, it's not enough. Can you help me understand or explain how the fifth memorandum opinion and order from 1994, I'm thinking about paragraphs 95 and 96, which talks about puts and when puts with other terms of an agreement can be found to establish de facto control. Can you explain to me your view, I mean the commission's view, on whether or how that provided fair note, the terms of those paragraphs, or if there's else, you can look elsewhere too, but that's the only ones I found, but if there's others, I don't mean to confine you to that, but did that provide, did that give notice or not? Well, your honor, the commission's 2015 order and the court's decision gave petitioner a fair notice. I mean, there's the precedent, the court in the SNR wireless decision. I understand your argument about that. The argument as to whether you have to have, you know, a management contract thing, as I read it, it says whether put options in combination with other terms to an agreement, deprive an otherwise qualified control group of de facto control, they're doing it in the negative there, right? Deprive them. So, what does that signify if you have a put option and other terms of an agreement? It doesn't have to be, I think they do, for example, management orders, but it I'm having trouble. So, focusing on those paragraphs, does it or does it not alert folks that a put agreement combined with other terms of an agreement that they're going to force or are some level of likely to force a sale by the designated entities? Sure. The commission's had more than fair notice of our finding under the SIP number and opinion in order based on our order and the court's decision. The commission's point in the revamped order was that the petitioners had not identified any of the problems with the put that we had previously identified because they didn't make any material changes to the put right in their agreement. I mean, in the 2018 agreements, in the context of the 2018 agreements, you have the same situation that you have to force, same story, different day, which is that the essentially we have, there are three things that happen. First of all, DISH is still allowed to control when and how petitioners use their licenses, which determines whether or not the petitioners can pay off their massive financial obligations to DISH. Two, the financial obligations are still massive. They might have changed the form of their debt, but the amount of it is still the same and because of that and because of a new dividend requirement, when you combine the debt with the dividend, which petitioners and startup companies with no revenue are never going to be able to pay, and turns into preferred equity, which functions like that and must be paid off first at liquidation, you end up in the same place that you did before, where the petitioners are never going to be able to turn a profit. So if you're sitting there under those circumstances and you're looking at the put right, and I mean, the put rights changed, I mean, the changes are superficial. They have two put rights now rather than one and the window stays open longer, but that's it. So if you look at those circumstances and you're led to the same place that the commission was at and the court was at in the first phase of this case, which is that the petitioners have an overwhelming incentive to exercise the put right or just to sell their licenses to DISH down the road because it's the only way that they can avoid certain financial failure. If you're in a situation where you can take the generous rate of return on the put right without having to meet any of your construction deadlines and without having to pay off your debt to DISH, of course you would do that. Of course you would do that, and the commission was also looking at this in the context of the fact that the petitioners are now six years into their license term with their build-out milestones quickly approaching. And let's talk about that for a second. In order for the petitioners to keep their licenses by October of 2025, each of those licenses have to provide service to 70% of the population covered by the license. If they don't, they default back to the commission. With those construction deadlines looming and no construction, no use of the licenses to date, the commission recently found that the petitioners would exercise the put right. So, Ms. Flood, can I just paraphrase what I thought I heard you say right there just so I can make sure that I get it? I thought I heard you say that in the prior order, the FCC made clear that the control problem was that the way these arrangements were organized, the only way to avoid certain financial failure on the part of these companies was to exercise their put right. That you had a situation that when everything was combined, the fact that DISH was controlled within how these companies could use their licenses, they had this massive debt to DISH, and they had this attractive put right, that that was the circumstance that created control. And that notice then was given that if they were going to cure, they would have to address those and they didn't address them sufficiently. Is that a fair summary of the argument? Yes. As we explain at length in the order, in order to resolve our previously articulated concern under the guidance in the Fifth Memorandum of Opinion and Order, the petitioners would have to make material changes to the agreement. And the changes they made to the put right were superficial. And because they did not make material changes that resolved the clearly articulated terms, and you remember the court in its last decision said that the Fifth Memorandum of Opinion and Order clearly presaged the commission's control finding. The commission found once again that the petitioners were under DISH's control under the Fifth Memorandum of Opinion and Order. Judge Edwards expressed concern about the fact that the commission in the past has never found control when there hasn't been a management services agreement. That goes to the commission's holding that the petitioners were under the control of DISH under the intermountain microwave factors. As the commission pointed out, that's separate and apart from our analysis of control under the Fifth Memorandum of Opinion and Order. So if the court disagrees with our intermountain microwave analysis, then you shouldn't because your decision is reasonably, reasonably explained. But if you don't, the court can still affirm the commission under the Fifth Memorandum of Opinion and Order because the rulings are distinct. And the management services agreement wasn't a factor in our analysis under the Fifth Memorandum of Opinion and Order in 2015, and it wasn't again in 2018. What's your response to Ms. Dixon's initial point that perhaps that wasn't clear enough for her client and that the commission really was obligated under this court's prior ruling to sit with them and explain that really what the issue is here is the way in which you've created a situation that is a carrot and a stick and a sword for the client and that that's what needed to be addressed. She says procedurally, the commission staff needed to respond to their calls and explain how they could have cured. Why is she wrong about that? Because nothing in the, for several reasons, Your Honor, but the first one, and I think this came out during your exchange with counsel for petitioners, is that nothing in the court's opinion requires that. I mean, it clearly says at page 1046 of the opinion that what the court wanted the petitioners to have, the remediated court wanted petitioners to have the opportunity to renegotiate their agreements with Fish. Nowhere in the opinion does the court describe the cure opportunity as an opportunity to renegotiate with the rights to control finding the agreements between the petitioners and Ditch. Presumably, I mean, the commission, and we point this out in our briefs in the menorah, the commission has great discretion under Section 4J of the Act to order its own proceedings, and this court's practice is to leave remand procedures to the agency. So if the court, in its last decision, was going to take the extraordinary step of telling the commission how to conduct its remand, presumably, it would have described the procedures in its decision. I also want to make a distinction here. Counsel for petitioners uses staff and the commission interchangeably, and she refers to the ClearComm procedures. There's an important distinction there. The reason is that any interactions between the applicant and ClearComm and the staff took place because that application was being handled by the commission's staff. The commission delegated it down to the commission's wireless bureau to handle it here. That's true. We understand that case law. Nonetheless, you got to understand that it dulls our brains some when we look at the agency, and one part of the agency is allowing something, and another part, that's not impressive. But you're right. You generally have the case law on your side. But don't think we're not affected by that. You're all in the same building, so to speak. If some parties are coming out advantaged, so to speak, and other parties are not coming out in the same way, a judge, by definition, is going to say, gee, that's troublesome. It's the same agency. Do they not talk to one another? But in any event, let me ask you one thing and see if I'm getting you right. If I'm understanding your argument, it is essentially that an overwhelming, that they should have understood that an overwhelming incentive to exercise the put right ends the analysis. In this case, that ends the analysis. They should control if you have an over, if I'm hearing you correctly, if I'm trying to tease out, I'm really mundane in this way. I like to tease out straightforward principles of law if I can. What I hear you saying through all this maze is, we told them before, and we're telling them again, if there's an overwhelming incentive to exercise that put, there's control, and that's it. Case is over. We think on the facts of this case, there's clearly an overwhelming incentive to exercise the put. We did. We found an overwhelming incentive to exercise the put because they didn't, they have their notice, they didn't identify, or they didn't resolve problems that had been clearly identified by the commission in 2015. No, no, but I'm just trying to, if we wrote anything, it seems to me that's what you would really want it. Now in the totality of the circumstances test, if the court finds in reviewing the agency that the agency was correct in finding, there was an overwhelming incentive to exercise the put, that's the end of it. We don't have to go to any other factors that ends it. That's the legal principle that governs. That's what you're saying, right? Yes, and under the standard review, and it's a very deferential standard review, and in the past case- No, no, no, I get all of that. I just want to make sure you're that's dispositive. You don't have to go through factors seven, 12, or anything else. If you find that you're honest, we win. If we are right on that finding, we win. We do. You would not have, I mean, but we also were correct under, I don't want to give up and say that we were also correct under Intermountain Microwave. Judge Jackson, can I- I'm sorry, before you leave that, because I'm a little confused by Judge Edward's framing of this. My understanding is that you and that this court actually upheld it. In other words, that you looked at the agreements that previously existed, that under the fifth M&O or whatever you said, there's a put right incentive, it's too great, and that's one of the reasons why we're finding control, and that the original panel agreed. They upheld your substantive view of that, but they said the other side, the petitioners, should have had an opportunity to make changes to their agreements to solve that problem. You then went back and said, here's the procedures for you having the opportunity to make those changes, and when you looked again at the renegotiated agreements with DISH, you said you haven't solved the problem that we previously identified, and that the Court of Appeals actually affirmed that substantively with respect to that issue. Am I wrong about that? No, you're right. I'm not disagreeing with that. I'm just trying to understand, you're heavily resting on that. I'm trying to understand what your argument is, and as I sit here listening, that's the essence of your argument. We told them it before, they didn't fix it, and they still lose. But that's- bottom line, you're saying that's it. That's this case. You're saying that's one route. She can answer however she wants. I want her to understand what I'm hearing. What I'm hearing is that's the crux of this case. There's an overwhelming incentive to exercise the foot right. That's control, period. We told them that before, they didn't fix it, they lose. We'll take that. We also think we won under Intermountain Microwave, that Judge Jackson's articulation of my argument is much better than mine, so I'm just going to rest on that. But Judge Jackson, I wanted to go back for one second. My point that I was making about the fact that the commission was going to decide this and not the Bureau is as follows. It is well established, and this court reiterated this in the Antinor Wireless decision, that the commission is not bound by the informal guidance provided by its important to make the distinction between ClearComm and the other applications that the petitioners rely on their brief. All of those were decided by undelegated authority by the commission staff. Here, the commission was deciding it. So the commission had already provided the petitioners substantial guidance on how to control their control problems. Where that put us was, even if the commission had directed the petitioners to sit down with its staff to provide any more guidance than the commission had already provided, and even if the staff sat down with the petitioners and negotiated terms and proposed those to the commission, the commission could still disregard them. So the petitioners here aren't similarly situated to any other applicant that came before them. So even in the terms of Judge practice, to the extent that the petitioners here are pointing to ClearComm as a prior practice, that was at most, you would say, a practice of what the staff would have thought about the circumstances. ClearComm can't possibly establish precedence for what the commission itself would have said. That's absolutely right. And, you know, the Petitioner's Council makes much of the commission statement in one of its prior orders about the fact that it's our usual practice to have our staff sit down and talk about control problems with a bidding credit applicant. It's our usual practice. Because that's because, in most instances, these applications are handled on delegated authority. Here, the commission recently determined that in a case involving $13 billion in spectrum licenses and $3.3 billion in bidding credit, it was going to credit eligibility in the first case. Now, with the judicial remand, of course the commission's going to keep that decision to itself. And given that the commission isn't bound by the decisions of its staff, why would the commission direct the petitioners to sit down, or why would the commission direct its staff to sit down with the petitioners and hash out terms? I just want to point something out. I'm getting a little confused here. Yeah. Why would the commission direct its staff? Are you talking about direct commission staff, or are you treating, like, here the Wireless Bureau, are you including them within your staff? I'm getting rather confused. I'm sorry. I'm talking about the staff in the Wireless Bureau. I'm not talking about the commissioner's personal staff, like the advisors to the commissioner. What the petitioners wanted is they wanted, and I apologize, it's being too insight-based, and I apologize for the confusion, to clarify what the petitioners wanted was they wanted to sit down with staff in the Wireless Bureau to hash out terms. And, you know, you could see a discussion of this in paragraph 24 of the remand procedures order. We cite a pleading filed by the petitioners. The petitioners wanted to sit down with Wireless Bureau staff over a series of meetings that take place by their estimate that would take more than a year to actually rewrite the terms of their agreement. So, in other words, what would happen is they would come in with their agreement, and the staff would get out the blue pencil and mark everything up, and the petitioners anticipated that that would take more than a year. In fairness, Ms. Flood, there are so many variations on that notice argument. I think what they're really saying in fairness is they wanted to get a sense of how folks at the FCC thought that they might avoid the appearance of overwhelming incentive. That's clearly what they're talking about. So, give us your best sense. Now, we may not, you still may not make it, but if I'm an attorney, I would like to be able to sit with FCC, anyone in the FCC. We got a problem here with this put. We don't want to look like we have an overwhelming incentive. Do you have any suggestions? We may or may not take them. We know the commission won't be bound by what you're telling us, but give us some guidance because the totality of circumstances test can be utterly ridiculous in some cases. The one thing we know is this put thing is a problem. Do you have any way we can avoid this problem? That's not useless. Your Honor, the standard here, and I hate saying this because you know this, I mean, you know, you've written a lot about administrative law, but the standard here is it's an abuse of discretion, and the commission does not abuse discretion in determining that it shouldn't require, so there's no need to require a staff to sit down with a petitioner. No, no, no. I have more guidance about how to. I understand your formal argument, and for the most part, your formal argument is strong in terms of what procedures we can tell the commission they had to follow on remand. I'm not generally, I'm just a little concerned that you're overstating your position and suggestion. There's nothing to be gained by allowing petitioners on a remand in a huge case with a lot of money where one issue is huge and overriding, and all I want to do is talk to some folks to get some guidance how you can avoid the appearance of bothering the commission. I think it's ungenerous to suggest there's nothing to that. I think that's ridiculous. You're a smart lawyer. The other side has smart lawyers. I'm a smart lawyer, and I agree with it. There is something to be gained by that. Can we write that in the law? Probably not, but there's definitely something to be gained. You might think there's something to be gained, and the petitioners obviously think there's something to be gained, but the commission did not abuse discretion here in finding that there wasn't enough to be gained. I hear you. I was going to say, Judge Millat, you were asking about the leasing restriction, and I actually have a page for you to look at if you want to go back to that. About the what restriction? The leasing restriction. You were asking whether or not the ordinary courses, if I remember correctly, you were asking whether the ordinary courses business exception was retained in the 2018 agreement, and it wasn't. If you look at, or at least not as relevant to the commission's analysis, if you look at page 1047 of the joint appendix. Sorry, can you repeat the page? Sure. It's joint appendix page 1047. Thank you. So, if you look at, this is section 6.18 of the credit agreement. So, it's a red line. So, it starts with the language from the 2015 agreement, and then the red line changes reflect the changes that were made in the 2018 agreement. So, as originally written, this provision said, the loan party agrees that it shall not, without the prior written approval of the lender, which approval may be withheld, lease, transfer, otherwise disposed, is this property or asset now owned or hereafter required. Okay. What the petitioners did, under their own reading, what that means is, because they're reading property or assets to also cover licenses, what that means is, before it was amended, the petitioners could not lease their licenses without DISH's prior written approval unless it was in the ordinary courses business. They amended the language, so it says property or assets now owned or hereafter required except for the sale of non-major assets in the ordinary course of business. So, what they did was, they amended the language so that now that ordinary course of business exception to the prior written approval requirement only applies to the sale of non-major assets. What the commission was concerned about was the lease of major assets because major assets include licenses. So, the ordinary course of business exception, which even under the petitioner's own interpretation of their agreement, would allow the petitioner to lease their licenses in the ordinary course of business without DISH's prior written approval, that was in 2015, it no longer applies now. And that was the commission's point in finding that the leasing restriction was new. I mean, they added language about what a major asset is in the 2018 agreement that wasn't there before. It defines a spectrum license as a major asset. And so, the commission looked at the terms in the 2018 agreement and said, wow, okay, so before the lease restriction didn't expressly cover licenses and there was this ordinary course of business exception, why did you amend your 2018 so the lease restriction now expressly covers licenses and you've eliminated this ordinary course of business exception? Which to their point, leasing wasn't an issue before. I also want to point out this notion that the commission won't move the goalpost on leasing. The reason the commission looked at leasing is because it was doing its job. The petitioners made leasing an issue when they were rebutting the comments filed by opponents of their application. They came in and it was their expert that said, no, they are not likely or it's not inevitable that they will exercise the court right because among other things, they can monetize their licenses through leasing. So, the commission looked at that and said, okay, well, can they lease? So, we looked at the 2018 agreement and we saw the language that said, effectively, if they wanted to lease any of their licenses, they would have to get prior written approval from DISH. And then we went back and looked at the 2015 agreement and we said, wow, they seem to have lost discretion in 2018 that they had in 2015. And the commission found that to be significant. When Ms. Stetson was right, the ordinary course of business language is still there. I apologize, but it doesn't function the same way it did. It does not function the same way. She may have a different reading of it. This is the commission's conclusion. It does not function. I don't think Mark has any questions. I do not. And this gets back to the role of the Bureau because it is really hard for companies trying to navigate this space with the totality of circumstances tests or divining the converse meaning of the order, the fifth memorandum opinion order. And it gets even harder when the commission allows its wireless Bureau, which is probably quite expert in this area, to issue approvals of agreements for the status of being a designated entity without any explanation. And as best public can tell from whatever they're able to piece together, it looks, it looks, I mean, their argument is it's the same. They're talking about AWS, so tell me if I've got the wrong ones, but AWS, these are the post-2015 ones, AWS, BITSO, and Advantage Spectrum. And when all the commission goes is, oh, that was just our little Bureau. That seems a bit too dismissive because that's a source of guidance and information. They are real decisions with real legal consequence and practical consequence. And so did the commission just say, we're not bound by the Bureau because it had nothing more to say as to those? And if that's true, isn't that a problem? Your Honor, the court in the prior case, the commission can't be bound by the decision by staff because those one-word grants don't provide any reasoning behind them. They're your agent. They're your agent, yes, Your Honor, but Your Honor, but in section five of the act, Congress established that the commission can delegate matters to its staff, but that the commission is not bound by the decision book. Can't be bound by them, but are they relevant? Are parties supposed to be able to look at those and at least try to define some guidance as to meeting these standards that you have, or is your position when you say we're not bound that you can look all you want? It's 50-50 whether we will agree or not at the end of the day. That's a very harsh environment in which to expect companies to operate. It's not, Your Honor. I mean, I will respond. My response is this court's opinion in the prior case where the court at length- Because you're not bound by them, but that's a different thing from the commission saying, tell me if I'm wrong. Here, we're not bound by them, but when we leave them in place, don't pay them any attention. Nobody can rely on them. Your Honor- And that's an aspect of their reasoning in this case that I find troubling. Your Honor, but if parties know that the commission is- Two things. If parties know, the petitioners should know, because the court in the prior case told them that the commission is not bound by the decisions of the staff. Can't be bound, but are these meant to be informed? Can people learn from those decisions? No, they can't, Your Honor, because they can't. I mean, for multiple reasons, as the court pointed out. The AWS FDCO decision, I don't know if it is. We don't have an explanation. We don't have a full record. I don't know everything that the Bureau was looking at in those cases, but if I'm going to offer a hypothetical and we're going to say it's the XXX company, and let's imagine their facts are identical. Their agreement is identical to the one that was proposed in 2018 here by Northstar and SNR, and the Bureau says, fine, go get your bidding credits on an identical agreement. Is it rational for the commission to say, or is it even permissible for the commission to say, we're fine, we're going to say the opposite here, and we're good with having complete inconsistency in our internal decision making? Your Honor, can I do a clarifying question about your hypothetical? Is it the same agreement, or is it the same agreement and companies are in the same circumstances? I mean, are they the identical company? I'm going to tell you it's the same. They're not the same company. Of course, they can't get a different answer in two places, but the facts are all the material facts. There'll be different names for the companies, who the companies are is different, but the material facts, every material fact cited by the commission in this decision here is the same. Your Honor, presumably if the material facts are the same and the agreements are the same, then the bidding credit application would be granted to party number two, but I mean, that's not what happened here. No, no, why would it be? You just said, I'm assuming one is decided by the Bureau and one is decided by the commission, and the commission is not bound by one. So, the Bureau goes first in hypothetical case with the companies XXX, and they go, okay, we don't find a de facto or de jure control problem here. And then Ethel Warren Weier and Northstar come, and they go, wait, that worked. We are going to copy that, cut and paste, change the names of the companies, but all the material facts are the same, and the terms of the agreement are the same, and they come to the commission, and the commission says, no. Your Honor, the commission retains the right to determine that its staff got it wrong. I mean, under your hypothetical, the agreements could be the same, and both applicants could be in the same position, but the commission is the ultimate decision maker. Do you have any way to distinguish AWS, FIDCO, or Advantage Spectrum? I don't, Your Honor, because as the court pointed out in its prior opinion, there's no Bureau decision explaining why those applications were granted. I don't, you know, this is the court's point in the prior case. How can the commission come in and say, in following up on Judge Millett's point in a couple of ways, in a situation in which the Bureau says, this looks good to us? In the actual process, the way that it works, does the commission ultimately sign off on every Bureau determination? No, Your Honor, the commission does not review them. Under Section 5 of the Act, what essentially happens is the commission can delegate matters for its staff to handle, and when the staff disposes of it and issues a decision, or in this that has the force of law, unless it's challenged up to the commission. So we don't really have the conflict that I think Judge Millett was alluding to with her hypothetical, because the commission has not said in Scenario 1, yes, we agree with our staff on these facts, and then in Scenario 2, it comes to them individually without the staff, and they say don't know what the commission actually would have held, except when it comes to it in the second instance, right? That's correct, and also the commission doesn't know why the Bureau held what it said. So even if we have a world in which the Bureau's representations and views are meant to inform the commission, let's assume that the Bureau did give all of its reasons, it laid it all out, and there it was, and it says in that scenario, we believe there is no control, everything is fine. Even if that is the case, I think the question here would be whether the commission abused its discretion in saying that we don't need that information. We're going to take this one ourselves. We don't need to hear from the Bureau, because it seems as though Ms. Stetson's argument was the commission had to send it to the Bureau and have the Bureau work with the parties and come up. So is there a world in which the commission could say, no, no, because of the amount of money, because of the scenario, we're going to handle this one ourselves, and we're not going to designate the Bureau to sit down with you and come up with its own informative determination as to what should happen. Yes, Congress granted us that authority in Section 5 of the Act. The commission can determine what it's going to delegate to its staff, and the commission can decide when it wants to keep something for itself. When they delegate authority, can an appeal be taken from the Bureau? An appeal cannot be taken from the Bureau straight to court. It has to go to the commission first. It has to what? No, I don't mean a court appeal. Oh, yes, you can challenge it to the full commission. And if the commission decides we're not going to look it over, does the commission feel bound by that decision because they've declined to review it? Well, if you challenge, if a party brings an application to the commission, the commission has to, I mean, the commission should decide it. No, no, no, wait, wait. I may be recalling things correctly, but that's why I wanted your clarification. If a party says we want to seek review from the Bureau's action, and the commission says, seek review with the commission, the commission says we don't want to review it, so it stands. Okay? Is the commission bound in the future by that disposition? Can I have a clarifying question, Your Honor? Sure. When you said the commission doesn't want to decide it, does that mean the commission doesn't take action, or the commission- The commission says we are letting it stand. So they affirm the Bureau. They issue an order saying- We are not going to change this disposition. My recollection is over the years that that happens, and they simply say we're not going to change this disposition. If the commission affirms, if the commission issues an order, Your Honor, that affirms the Bureau's grant and beginning credit application- No, not the government. They just say we're not going to review it. I may be mistaken in my recollection of how this works. My understanding is the agency, the SEC, can say we're not going to change this, we're not going to review this disposition. I'm not familiar with that process, Your Honor. Typically, what happens is the commission only decides that it's not going to review something when it's brought to the commission's attention. The commission affirms the Bureau, but this process where the commission doesn't issue an order but somehow affirmatively decides that it's not going to act on it, I'm not familiar with that. Okay. In your understanding if the commission affirms an order without writing anything, are they bound by the Bureau's decision? Your Honor, if the commission affirms the Bureau's decision, I believe it has to write a written order. At that point, it would become commission precedent. Just to use an example, like an airdate wireless, which is discussed in the petitioner's brief. What happened was the Bureau granted the airdate wireless application with conditions. It was challenged, and the commission affirmed the Bureau's determination that the applicant was eligible for bidding credit. At that point, not the procedures, because the commission didn't affirm the procedures because it didn't say anything about the procedures, but if somebody wanted to come in and say you granted the airdate, you, commission, affirmed the Bureau's grant of the airdate wireless bidding credit application, like the substantive grant, that becomes commission precedent. I hope I answered your question. Yes, you did. Thank you. Ready for the question? No. Okay. Thank you, Ms. Wood. Thank you. This does only be three minutes. Thank you, Your Honor. I want to talk briefly about what SNR and Northstar had notice of and what they didn't. What SNR and Northstar had notice of was that he put option itself under the fifth M.O. and O. is not an issue. It's not a control concern. What they had notice of, also under the fifth M.O. and O., paragraph 96, is what the commission emphasized over and over again in the 2015 decision, which is concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of investor protections. That's when the put option increases the concerns. That was the basis of the 2015 ruling. That's why that phrase that I just read you occurs at least five times in that ruling. The management services agreement was a huge feature of the 2015. If M.O. and O. doesn't confine itself to having a, doesn't say a put order is only improper if combined with a management services order. It says just other terms of the agreement. Correct, but in terms of what we understood the problem to be, and you can see this at pages 36 to 37 of our opening brief and 25 to 26 of our reply, the management services agreement was the culprit. So we had noticed that that under the 2015 agreement was a problem. Put option combined with the management services agreement. We had noticed, as your honor pointed out, that AWS Bidco and Advantage Spectrum had both been permitted to include standard put options in their designated entity agreements with their investors. Because of course, this is a standard provision in a designated entity agreement. Those are the things we had noticed though. Here's what we didn't have notice of. We didn't have notice to Judge Edwards's point that the commission would do something it never has done before, which is to conclude that even in the absence of the culprit management services agreement that was such a fundamental feature of the 2015 decision, even in the absence of the MSA, that a put option itself would be suggested to exert so much leverage that it couldn't do anything. We did not have notice under the 2020 analysis that the commission would- Did the opinion here say that the put option itself, I think you just said, was the problem here? Or did it say the put option, did the decision say the put option in combination with other terms in the agreement that limit- I know you have disagreements with some of that, but that limit the ability, in the commission's view, that limit the ability to develop the business? I think that is part of the commission's pivot in 2020, yes. In 2015, it was put plus management services agreement equals control. Now it's put plus these other standard investor protections. By the way, they have never been found to be an issue. I cited you to footnote 232 of the 2015 decision where the commission says these protections are okay. Now the put option in combination with those standard investor protections is the problem. We could not have reasonably had notice of that because the put option is standard and, of course, the Baker Creek investor protections are standard. We have no answer or no notice of the fact, Judge Jackson, to your questions, both to me and to Ms. Flood, that even if the commission decided that it wouldn't have its staff meet with us, as it's done every time before, even if the commission decided that there was control, that we would be punished. This isn't just a straight-up classic abuse of discretion review. This is a situation where these petitioners were not given sufficient notice that if they actually followed form with the other designated entities in their same auction, they would nevertheless be found not to be in control of their designated entities and would be punished. But why do you say that they're punished in light of the very good point I thought that Judge Millett made earlier, which is regardless of all of the rest of this, at the beginning of this process, with respect to companies that were stood up within two weeks or so of the actual auction, those companies said, we are going to pledge to put up all of the money that would be necessary to buy the spectrum rights. I mean, there was no lack of clarity with regard to the obligation to pay for any licenses that they actually want in the auction. And so all of this notion of whether or not at the end of the day they got the discount, seems to me that it has to be considered in light of the broader set of circumstances. Why is it punishment not to give them the discount that the FCC determines later based on all of the Why is it punishment under those circumstances to say, but you still have to pay the full price as you agreed to at the beginning? Your Honor, I think if it weren't a punishment, I don't think that the first SNR opinion would have come out the way it is. Of course, it's a punishment. These entities, these small businesses Is a punishment? Are there words that say that? Yes, there's a default penalty that's described in the regulations. And in this case, it was to the tune of $500 million. But here's the other important point, what we didn't have notice. Sorry, was that default penalty? Was that for not qualifying as very small businesses? Or was that for not carrying through on the commitment to pay the full bids? It was for not being in a position to pay the full bids because we did not get the benefit of the designated entity discount, which we had submitted for in the short form application. But you had committed to pay without that status. You had committed to pay either way. We had committed to pay as designated entity. Either way. No, you had committed to pay either way before you made a bid. You can't commit in advance to pay only if I get my designated entity status. And we had sought designated entity status along with that commitment. That initial commitment. I'm trying to get a very clear answer to this question here. That initial commitment before you start bidding, that whatever the bid we make is, we will pay it, is what was made. There was not an asterisk that said, if we get designated entity status. Your Honor, I think that's right. But let me add this as well. We submitted, even in the knowledge and ability at the time, that this didn't exercise control. So we made that commitment on the understanding, to Judge Edwards's point, that we could look at prior Bureau practice and understand where those lines were. And that leads me to my last point, if you'll let me, which is, these designated entities were left completely unprotected by the commission. Unlike every designated entity before, if the commission, to Judge Edwards's also earlier point, if the commission had actually permitted its staff to sit down with them, and by the way, every commission decision is drafted by the relevant Bureau. So if the commission had permitted Bureau staff to sit down with these entities and had discussions, all of these issues that we've been talking about for the last almost two hours could have been worked out. And if not worked out, then the parties would have walked away without designated entity status. But it was incumbent on the commission and on its staff to give us that opportunity. And because it didn't, and led to a 2020 decision that was completely foreign to us and unanticipated by us, either this is another terrible procedural footfault on the part of the commission, or it is a straight up administrative procedure violation, because there was no way for these designated entities, these small businesses, to know that they would be found still not to have control of their own businesses. Any further questions? Thank you very much. The case is submitted.
judges: Millett, Jackson, Edwards